# United States Court of Appeals

## For the First Circuit

No. 08-2263

UNITED STATES OF AMERICA,
Plaintiff, Appellee,

v.

33.92356 ACRES OF LAND, more or less, situated in Vega Baja,
Commonwealth of Puerto Rico; JOHN DOE 98CV1664;
DEPARTMENT OF THE TREASURY FOR THE COMMONWEALTH OF PUERTO RICO,
Defendants,

JUAN PIZA-BLONDET,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Francisco A. Besosa, U.S. District Judge]

Before
Boudin, Selya, and Dyk,[*] Circuit Judges.

Paul E. Harrison, with whom Francisco Diez and J. Wayne Mumphrey were on brief, for appellant.
Aaron P. Avila, Attorney, U.S. Dep't of Justice, with whom John C. Cruden, Acting Assistant Attorney General and Jeffrey M. Tapick, Attorney, U.S. Dep't of Justice, were on brief, for appellee.

September 11, 2009

---

[*]    Of the Federal Circuit, sitting by designation.

**DYK**, <u>Circuit Judge</u>. This case involves a taking by the United States of 33.92356 acres of land. Juan Piza-Blondet ("the defendant"), the owner of the property, appeals from the final judgment of the district court awarding compensation in the amount of $375,300. The defendant claims that the district court committed a number of errors in the course of the valuation proceedings. Because we conclude that the district court did not err, we affirm.

## I.

The approximately 34-acre tract at issue is the site of a radio beacon used by the Federal Aviation Administration for aircraft navigation. The 34-acre tract was originally part of approximately 400 contiguous acres of land owned by the defendant. The 34 acre portion was leased to the government by the defendant during the period from 1978 to 1996. In late 1996, a dispute arose between the government and the defendant over the amount due under the lease, and the government indicated that it would initiate condemnation proceedings to acquire the land. In anticipation of a taking by the government, in 1997 the defendant formally segregated the 34-acre tract from the 400 acres into a separate parcel, but the ownership of both the parcel and the 400 acres remained with the defendant, and the use of the land did not change. In 1998 the United States initiated a condemnation

proceeding with respect to the 34-acre parcel.[1]  In answer to the complaint in condemnation, the defendant conceded the public purpose of the condemnation and the power of the government to take the property, disputing only the amount of just compensation.

For environmental reasons, the 34-acre parcel has been, and continues to be, restrictively zoned "LT-B2" ("B-2") by the Puerto Rico Planning Board ("Board").  Because of this zoning, the uses of the land are restricted primarily to coastal protection, scientific investigation, passive recreation, fishing and the construction of fishermen's piers so long as they do not affect the surrounding mangroves.  These uses are referred to as conservation and passive recreation.  Most other uses of the land are forbidden without a variance or permit or some such permission from the Board and other regulatory bodies.

In accordance with 40 U.S.C. § 3114, at the time of the taking the government deposited $375,300 in the district court's registry as estimated just compensation.  The government's estimate was based on a "highest and best" use of the property of conservation and passive recreation under the applicable B-2 zoning.  The defendant disagreed with the government's estimate, and requested a jury trial on the quantum of just compensation

_____

[1]     The government sought to condemn both a leasehold interest in the land spanning the period from 1996 to 1998 and a fee simple interest in the land as of the date of the complaint in condemnation.  Only the valuation of the fee simple estate is at issue in this appeal.

pursuant to Rule 71.1(h) of the Federal Rules of Civil Procedure.[2]

In October 1999, both parties filed motions asking the court to decide the method by which the value of the parcel should be calculated. The court held an evidentiary hearing and ultimately issued an order addressing the question:

> The government supports the most commonly used method, known as the "before and after method" by which the value of the entire parcel is determined before the expropriation, and then the remaining parcel is reevaluated after the condemned portion is removed. Defendant Juan Pizá-Blondet, owner of the property, wants the condemned portion, which is at the center of the larger parcel, valued independently, because it was segregated on December 26, 1997. We note that Pizá-Blondet segregated the portion after his dispute with the government arose over the amount of rent to be paid.
> In order to use the before-and-after method, [the government] must demonstrate a unity between the separate parcels . . . .

United States v. 33.92356 Acres, No. 98-1664, dkt. 82, slip op. at 1 (D.P.R. Nov. 22, 2004). The court noted that there was unity of ownership and contiguity between the parcels, but that there was a dispute about the unity of use of the parcels. Id. After both parties provided additional evidence and briefing, the court concluded that "there is an issue of fact as to the unity of the highest and best use of the condemned parcel and the remnant, which

---

[2] Rule 71.1(h) states, in part, "In an action involving eminent domain under federal law, the court tries all issues, including compensation, except when compensation must be determined . . . by a jury when a party demands one within the time to answer . . . ."

- 4 -

is for the jury to decide.  If the jury finds that there is unity of use, the 'before and after' method of valuation will be used.  If the jury finds that the highest and best uses for the parcels are not the same, the segregated parcel will be evaluated as an independent parcel."  United States v. 33.92356 Acres, No. 98-1664, dkt. 113, slip op. at 1 (D.P.R. May 31, 2005).

The defendant retained an expert, Carlos Gaztambide, to testify as to the value of the land.  The expert filed two reports.  The first report estimated "the Market Value of the Fee Simple Estate" based on highest and best uses for construction of residences and sand extraction.  Neither use was permissible under the applicable B-2 zoning, absent permission from the Planning Board.

The first report opined that the 34-acre tract had two sections of different value, an upland section of about 19 acres and a lowland section of about 15 acres.  The report opined that the upland section was suited to residential use and sand extraction, and was therefore worth about $51,500 per acre ($50,000 per cuerda).[3]  This value was based on three "comparable land sales," two of which had already been approved by the Planning Board for specific residential development projects.  However, none of the three parcels appeared to involve B-2 zoned land.  By

_____

[3]     A "cuerda" is a traditional Puerto Rican unit of land measurement equal to approximately 0.97 acre. Webster's Third New International Dictionary 551 (2002).

- 5 -

contrast, the expert concluded that the lowland section had a highest and best use of "conservation or mitigation," and was therefore worth about $9,250 per acre (or $9,000 per cuerda). Based on these figures, the report claimed a total market value for the parcel of $1,120,000.

The report also opined that there was a "reasonable probability that [residential development and sand extraction may be approved] if adequate protection to or mitigation of the wetland is provided." Plaintiff's Motion in Limine ex. A at 5, United States v. 33.92356 Acres, No. 98-1664, dkt. 133 (D.P.R. Aug. 14, 2006). For support, the report stated that "B-2 zoning is not an absolute negation to development" and that "[residential] subdivisions have been approved . . . in numerous properties that have this zoning." Id. The report included aerial photographs, zoning records, and other documents as support. However, none of the documentary evidence indicated that the allegedly comparable property on which residential development or sand removal had been approved had been zoned B-2. The expert admitted in deposition that he had not spoken to anyone at the Planning Board about the 34-acre parcel.

The second report was created after the first report as an "addendum" which estimates the value of the "Fee Simple Estate of the Sand Deposits in the Subject Property." This report estimated the value of the sand deposits by capitalizing the value

of an estimated income stream from selling the sand, using a 15% discount rate to determine present value and an estimated cost of extraction of 20% of the anticipated gross income. By this method, the expert arrived at a value of the sand of between $3,000,000 and $6,000,000.

The government filed motions in limine to exclude Gaztambide's testimony. The district court referred the motions to a Magistrate Judge. The Magistrate Judge recommended that the court grant the motions and exclude the testimony because "many of [Gaztambide's] assumptions are either unsupported or contrary to existing facts." Report and Recommendation at 10, United States v. 33.92356 Acres, No. 98-1664, dkt. 155 (D.P.R. Apr. 24, 2007). The Magistrate Judge found that defendant had failed to establish that the land was improperly zoned B-2 or that a variance would have been granted: "Gaztambide's opinion, by itself, fails to establish a reasonable probability that the Planning Board would either change the zoning or grant a variance at any time in the near future." Id. at 12. Specifically with respect to residential development, the Magistrate Judge found that "defendant has failed to document a single instance that supports Mr. Gaztambide's assertion that the Puerto Rico Planning Board has ever, or is likely to, approve residential housing developments on land zoned B-2." Id. at 10. Similarly, the Magistrate Judge determined that Gaztambide's opinions concerning sand extraction were also

unsupported and "overly speculative." Id. at 14. The Magistrate Judge also noted that the expert was improperly double counting the value of the sand deposits by first including sand extraction as a highest and best use increasing the fee simple appraisal of the land, and second as a separate mineral deposit estate with a value independent of the rest of the land value. The Magistrate Judge further criticized the second report for appraising the value of the sand deposits by lost income, rather than by comparable land sales. Id. at 20.

Over the defendant's objection, the court adopted the Magistrate Judge's recommendation and excluded Gaztambide's expert testimony on the highest and best use of the land, relying on Federal Rule of Evidence 702. United States v. 33.92356 Acres, No. 98-1664, dkt. 167, slip op. at 2 (D.P.R. June 13, 2008). The court concluded that "[t]rial courts thus have a duty to screen evidence that is based on a speculative use of the property and exclude it from the jury's consideration . . . . [T]his court must decide whether the defendant's expert testimony satisfies Federal Rule of Evidence 702's relevance and reliability standards for its admissibility." Id. at 4. The court concluded that those standards were not satisfied:

> [The expert's] testimony that because part of the condemned property is incorrectly zoned as a B-2 district and that therefore residential development may be allowed there, fails to establish that there is a reasonable probability that the zoning regulations would

> change or that the necessary permits would be
> granted in the reasonably near
> future . . . . [The expert's] opinion was not
> supported by any documentation and [was]
> contrary to the existing facts.

Id. at 5-6 (emphasis added). The court scheduled a jury trial for August 18, 2008. Shortly before the trial was scheduled to occur, the defendant informed the government that he would introduce expert opinion testimony from Gaztambide on the value of the land based on comparable sales, and that the defendant himself would offer opinion evidence on the value of the land based on "his business experience." The court ordered the defendant to show cause as to why this testimony would be admissible in light of the prior order.

In response to the show cause order the defendant stated that Piza-Blondet would testify that the land was worth $143,000 per acre based on highest and best uses of residential development and sand extraction. This opinion was based on lots that "were originally zoned B-2 . . . [but] due to a variance which is a widely used tool/method, in Puerto Rico the zoning was changed from B-2 to R-1." Mot. ex. B at 1, United States v. 33.92356 Acres, No. 98-1664, dkt. 177 (D.P.R. Aug. 1, 2008). The defendant did not clarify what the contents of Gaztambide's testimony would be. The government in response pointed out that Piza-Blondet had stipulated that he "will not offer an opinion of value which differs from that of his expert witnesses." Resp. to Mot. at 6, United States v.

33.92356 Acres, No. 98-1664, dkt. 179 (D.P.R. Aug. 5, 2008). The government objected to Gaztambide's testimony because the defendant had given no "details about [t]his new opinion of value or the highest and best use upon which this new opinion is based." Id. at 1.

The court sustained the government's objection and ruled that "any opinion of value by any person based on sand extraction or residential development is EXCLUDED. The only valuation testimony that may be offered at trial, either by Mr. Piza-Blondet or his expert, Mr. Carlos E. Gaztambide, is an opinion of value based on conservation and/or mitigation." United States v. 33.92356 Acres, No. 98-1664, dkt. 180, slip op. at 1 (D.P.R. Aug. 5, 2008). The court also rejected defendant's motion to postpone the trial date, stating that "the non-jury [sic] trial will commence as previously scheduled on August 18, 2008." Id. The defendant made no objections to this order.

The parties then filed a "Stipulation for Consent Judgment" which stated that, "[b]ecause of the Court's prior rulings, including but not limited to [the orders] limiting the valuation evidence that the Defendant could introduce at trial, the parties hereby agree that a Final Judgment on compensation [in the amount of $375,300] should be entered by the Court that preserves the Defendant's right of appeal of the Court's prior rulings." United States v. 33.92356 Acres, No. 98–1664, dkt. 191, slip op.

at 1 (D.P.R. Aug. 19, 2008). The stipulation also stated that "[i]f the Defendant is successful in its appeal, the parties will revisit the valuation issue, with both parties reserving all rights to fully litigate the amount of just compensation owed for the taking of the interests in these consolidated actions." Id.

## II.

In view of the parties' stipulation, we must determine whether any of the court's rulings that were a predicate to the judgment were erroneous. It is well established that the landowner has the burden of proving the just compensation owed for the condemned property. Nat'l R.R. Passenger Corp. v. Certain Temp. Easements, 357 F.3d 36, 39 (1st Cir. 2004). The defendant contends that the court erred in excluding Gaztambide's valuation evidence based on the residential and sand extraction uses.

Under Rule 702, the opinion testimony of expert witnesses having "scientific, technical, or other specialized knowledge" is only permissible if "the testimony is based upon sufficient facts or data"; "the testimony is the product of reliable principles and methods"; and "the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Civ. P. 702.

Under the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., the trial judge is charged with a gatekeeping responsibility over expert testimony: "the trial judge must ensure that any and all scientific testimony or evidence

- 11 -

admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993).

In General Electric Co. v. Joiner, the Supreme Court supplied a further gloss on the standard:

> [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."

522 U.S. 136, 146 (1997). Thus, as this court has stated, "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." Ruiz-Troche v. Pepsi Cola of P. R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998). The standard of review for the exclusion of expert evidence under Rule 702 is abuse of discretion. Joiner, 522 U.S. at 139.

The valuation standard in condemnation cases is well established. Land must be valued according to the highest and best use. Olson v. United States, 292 U.S. 246, 255 (1934); Nat'l R.R. Passenger Corp., 357 F.3d at 39. However, as noted in Olson, evidence of the value of land with a specific highest and best use is only relevant if the use is likely to be reasonably probable "in the reasonably near future." 292 U.S. at 255-56. If a claimed use is prohibited by zoning, the property owner must show that it is reasonably probable that the relevant restrictions will be removed

in the reasonably near future.  <u>Wolff v. Puerto Rico</u>, 341 F.2d 945, 946-47 (1st Cir. 1965).

The gatekeeping role of the district court is particularly pronounced in condemnation proceedings under Rule 71.1.  While the jury tries issues of valuation, the trial judge must screen the proffered best and highest uses and "exclude from jury consideration those which have not been demonstrated to be practicable and reasonably probable uses."  <u>United States</u> v. <u>320.0 Acres of Land</u>, 605 F.2d 762, 815 (5th Cir. 1979); <u>see</u> <u>United States</u> v. <u>Certain Land Situated in Detroit</u>, 450 F.3d 205, 211 (6th Cir. 2006); <u>United States</u> v. <u>62.50 Acres of Land</u>, 953 F.2d 886, 891 (5th Cir. 1992); <u>United States</u> v. <u>341.45 Acres of Land</u>, 633 F.2d 108, 111-112 (8th Cir. 1980); <u>see also</u> <u>United States</u> v. <u>Reynolds</u>, 397 U.S. 14, 19-21 (1970).

The defendant here concedes that, as zoned, the 34 acres could not legally be used for residential development or sand extraction without rezoning or some variance or permit by the Board.  As a result, the defendant must show that there is a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future.

The defendant argues that the property was inadvertently mis-zoned B-2 by the Board, and that the Board would either change

the zoning or grant a variance.[4]  The district court did not abuse its discretion in concluding that there was no evidentiary basis for this opinion and excluding the testimony.

Gaztambide had not spoken to anyone at the Board or otherwise offered any support for his opinion that the Board would approve a rezoning, variance, or permits for residential development or sand extraction on this land.  Nor was there evidence that such variances had been permitted with respect to similarly zoned parcels in the past.  As the magistrate judge noted, the expert "has failed to document a single instance [in which the Board] has ever, or is likely to, approve residential housing developments on land zoned B-2."  Report and Recommendation at 10, United States v. 33.92356 Acres, No. 98-1664, dkt. 155 (D.P.R. Apr. 24, 2007).  There was no evidence that any of the parcels that Gaztambide had relied on to show residential development were or had been zoned B-2.  The expert also relied on applications to obtain permits for residential development on other parts of the 400 acres which the defendant had filed in 1999.  However, these applications remained pending in 2007, and to this day there is no evidence that these permits were granted.

---

[4]  The defendant argues in part that the land must have been mis-zoned because B-2 zoned land is supposed to be covered with mangroves, while a part of the 34 acres was not covered in mangroves.  However, the zoning regulations state that B-2 zoned land is "generally covered with mangroves," not uniformly and entirely covered with mangroves.  App. 107 (certified translation of P.R. Reg. JP 2498 § 8:01) (emphasis added).

- 14 -

Similarly, the expert had not reviewed or identified any document showing that sand extraction was ever permitted in land that is zoned B-2. In this case the support for the expert's opinion was sufficiently sparse that the court did not abuse its discretion in holding that the expert testimony did not meet the standards of Rule 702.[5]

Similarly, the district court did not err in excluding the defendant's own testimony as to the residential and sand extraction uses of the property. Piza-Blondet had previously stipulated that he would "not offer an opinion of value which differs from that of his expert witnesses." The district court was clearly within its discretion to exclude defendant's own testimony when the district court had excluded similar testimony by defendant's expert.

## III.

The defendant also contends that it was error for the court to hold that the "before and after" method was appropriate (if the jury determined that there was unity of use) and to refuse to exclude the testimony of the government's expert, Raul Lugo, utilizing the before and after method.

---

[5] The defendant also argues that it was an abuse of discretion to exclude the testimony of the defendant's expert because the motion in limine made by the government was not timely. Assuming that the motion was not timely, the objection was waived because no timeliness objection was made by the defendant in opposing the motion. In any event, the court was within its discretion to consider an untimely motion.

- 15 -

The before and after method is used in cases of a partial taking; the entire parcel is valued before and after the taking of the condemned portion. Where the condemnation is a partial taking, the before and after method is generally viewed as the conventional method for determining just compensation. For example, in a partial takings case involving an easement, United States v. Virginia Electric & Power Co., 365 U.S. 624, 632 (1961), the Supreme Court stated that the trial court "adopted an acceptable method of appraisal, indeed the conventional method, in valuing what was acquired by the Government by taking the difference between the value of the property before and after the Government's easement was imposed." In United States v. Grizzard, 219 U.S. 180, 182 (1911), the Supreme Court affirmed a compensation determination of $1,500 based on finding that "the whole land was worth $3,000 before said taking, and what was left after the taking was worth $1,500." See also United States v. 8.41 Acres of Land, 680 F.2d 388, 392 (5th Cir. 1982)("Federal courts have long held that an appropriate measure of damages in a partial-taking case is the difference between the value of the parent tract before the taking and its value after the taking."); United States v. 9.20 Acres of Land, 638 F.2d 1123, 1126-27 (8th Cir. 1981)("In partial taking cases, the proper measure of compensation is the difference between the fair and reasonable market value of the entire ownership immediately before the taking and the fair and reasonable market

- 16 -

value of what is left immediately after the taking."); 4A Nichols, The Law of Eminent Domain § 14.02, 14.31 (rev. 3d ed. 1981)("Virtually all jurisdictions allow the use of the before and after methodology, and many of them mandate its use or even its sole use."). The before and after method is particularly advantageous where either it is difficult to value fairly the condemned tract as a separate parcel or one of the parties contends that the remainder was harmed or benefitted by the condemnation.[6]

In this case, the landowner provides no persuasive reason why the before and after method would be unfair in assessing the value of the condemned parcel (assuming this is a partial taking). The landowner argues that, because the alleged parent tract is more than ten times larger than the condemned tract, a kind of bulk discount applies to the market value of the parent tract such that comparable large tract sales would be less per acre than comparable small tract sales making the before and after method unfair. No evidence was presented which supported this assumption. The

---

[6] See 4A Nichols, The Law of Eminent Domain § 14.02[4] (rev. 3d ed. 1981)(discussing the effectiveness of the before and after method in clearly and simply dealing with severance damages and situations in which no independent market value for the condemned parcel can be ascertained); see also United States v. Miller, 317 U.S. 369, 375-76 (1943)("[A] parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it . . . . If only a portion of a single tract is taken the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract . . . On the other hand, if the taking has in fact benefitted the remainder, the benefit may be set off against the value of the land taken.").

district court did not abuse its discretion in permitting the use of the before and after method in valuing the property, assuming a partial taking. This is not to say, of course, that the before and after method is always the best or the only way of appraising a parcel's value, but in the circumstances in this case, it is a permissible way of appraising value.

The defendant argues primarily that the before and after method was inappropriate because the 34 acres were separated from the 400 acre tract, and thus a partial taking did not occur. The defendant is correct that the before and after method used by the government's expert would be inappropriate where the parent tract is a separate parcel from the condemned tract. However, contrary to the contention of the defendant, the question of whether the parent tract is a separate parcel or is part of a single parcel with the condemned tract does not depend only, or even primarily, on the formal severance of the tract. The district court correctly ruled that whether this was a partial taking and the identity of the parent tract depended largely on whether there was unity of use between the parcels. As this court held in <u>Baejter</u> v. <u>United States</u>, 143 F.2d 391, 394-95 (1st Cir. 1944), whether the parcels are a "single tract" for takings purposes "does not depend upon artificial things like boundaries between tracts . . . whether the owner acquired his land in one transaction . . . [or] whether holdings are physically contiguous." The key question is whether

the parcels have an "integrated use." Id. The district court did not err in determining that the before and after method was appropriate if there was unity of use.

Defendant also argues here that the district court erred in submitting the unity of use to the jury. While unity of use is an issue for the court to decide, see Fed. R. Civ. P. 71.1(h); Reynolds, 397 U.S. at 19-21, unless some party objects, there is no ground for overturning a decision by the trial judge to submit the question to the jury in an advisory capacity. See Fed. R. Civ. P. 39(c). At the time of the ruling here, neither party objected to the submission of the issue to the jury. As such, the district court did not err in submitting unity of use to the jury.

**IV.**

The defendant raises a number of other issues which can be addressed briefly. The defendant contends that immediately before the scheduled trial the court unilaterally converted this case from a jury trial to a bench trial. Although the defendant was entitled to a jury trial on the issue of quantum, the court did nothing to deprive the defendant of a jury trial. The order of the court that mentioned the "non-jury trial" was responding to motions to postpone the trial date, and in that context it is clear that the mention of a "non-jury trial" was merely a mistake. Had the defendant objected, or had he merely called the error to the court's attention, it seems clear from the context that the court

would have permitted the case to proceed as a jury trial. In summary, the mention in the order of a "non-jury trial" is not reversible error.

The defendant also asserts that the court abused its discretion in failing to grant defendant's motion to continue the trial to reformulate his own testimony and that of his expert. The court is given broad discretion to manage scheduling; the defendant faces a high burden in establishing an abuse of discretion. See Macaulay v. Anas, 321 F.3d 45, 49 (1st Cir. 2003). In this case the court did not abuse its discretion in refusing to reschedule the trial. The case had already been pending for 10 years. The defendant had already had ample time to develop evidence of value for conservation and passive recreation uses. Furthermore, the fact that a number of different judges have presided over this case does not excuse defendant's own lack of timely preparation for trial.

We have considered the defendant's other contentions and find that they are without merit.

Affirmed.