RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA ex rel. TENNESSEE
VALLEY AUTHORITY,

　　　　　　　　　*Plaintiff-Appellee*,

　　　　　v.

1.72 ACRES OF LAND IN TENNESSEE; KARL THOMAS,
　　　　　　　　　*Defendants-Appellants*.

No. 15-5530

Appeal from the United States District Court
for the Eastern District of Tennessee at Winchester.
No. 4:13-cv-00033—William B. Carter, Magistrate Judge.

Argued: March 8, 2016

Decided and Filed: May 5, 2016

Before: CLAY, GILMAN, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Mark S. Demorest, DEMOREST LAW FIRM, PLLC, Royal Oak, Michigan, for Appellants. David D. Ayliffe, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Mark S. Demorest, Melissa Demorest LeDuc, DEMOREST LAW FIRM, PLLC, Royal Oak, Michigan, for Appellants. David D. Ayliffe, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. This is an appeal by the landowner, Karl Thomas, from an award made by the district court in a condemnation action brought by the Tennessee Valley Authority

("TVA") under the TVA Act of 1933, 16 U.S.C. § 831 *et seq.* In the condemnation proceeding, the TVA acquired a permanent easement running along a boundary of 34 acres of land in Coffee County, Tennessee. The issue of just compensation was tried before a jury. Following the close of testimony, the TVA moved for judgment as a matter of law based on its valuation of the condemned land. The trial judge granted the TVA's motion, concluding that the landowner had failed to meet his burden of proof in showing any higher value for the land taken. The landowner now appeals the district court's judgment, and we **AFFIRM.**

## BACKGROUND

### *Factual Background*

Thomas is an entrepreneur who owns four hotels throughout the country. He purchased a 34-acre parcel of land in 2013 for $160,000 with the intention of developing a first-tier hotel. Most of the property is zoned A-1, or agricultural-residential; a smaller portion is zoned C-1, or rural center district. The property is located adjacent to and is visible from Interstate 24, which runs between Nashville and Chattanooga, Tennessee. The property has always been used for agriculture. Indeed, since purchasing the property, Thomas executed a three-year farm lease agreement with two local farmers, grew crops, and also certified to the county assessor that he was "presently using [the property] as agricultural land." (App.R. 56, Application for Greenbelt Assessment.)

Since purchasing the property, Thomas had been in discussions with the TVA regarding its plans to construct a power line on a portion of the property running alongside Interstate 24. However, neither party could come to an agreement over how the power line would be built, where it would be located, or the price for the easement.

### *Procedural History*

On May 6, 2013, the TVA brought this condemnation action pursuant to 40 U.S.C. § 3113, with the filing of a declaration of taking and a deposit of $15,500 as estimated just compensation pursuant to the Declaration of Taking Act, 40 U.S.C. §§ 3114-15. The easement taken was 100 feet wide, consisted of 1.72 acres, and was for the purpose of installing electrical

power transmission lines.  The TVA ultimately constructed an above-ground power line on the condemned property.

Thomas answered the complaint and requested a jury trial on the issue of just compensation under Federal Rule of Civil Procedure 71A.  Before trial, Thomas disclosed his intent to present the testimony of expert witness Ron Wilson.  Wilson, according to the expert disclosure report, was expected to render an opinion that because of the power line, the property was no longer feasible for hotel development.  According to Wilson's expert report, "[t]hese types of power lines create both a visual and psychological barrier to guests thinking about staying at a hotel."  (R. 47-1, Expert Witness Disclosure, PageID# 182-84.)

The district court granted the TVA's motion to exclude Wilson's testimony, concluding that the proposed testimony was inadmissible under Federal Rule of Evidence 702 because of reliability defects.  The district court also concluded that Wilson's expert report failed to comply with Federal Rule of Civil Procedure 26(a)(2)(B).

On April 7, 2015, the case proceeded to jury trial on the sole issue of just compensation. Thomas testified about his experience in the hotel industry, including how he identifies and researches new markets.  Thomas talked specifically about the "demand generators," *i.e.*, the potential sources of future revenue that would support a hotel development on the property.  He testified that the property is optimally located for a hotel because it would draw customers from the nearby Bonnaroo festival, an annual three to four day music festival in Manchester that attracts many visitors each year.  According to Thomas, a popular annual event such as Bonnaroo can greatly contribute to the success of a hotel.  He testified that his hotel in Daytona Beach, Florida derives one third of its annual profit from the Daytona 500 weekend event, an annual motor race.  Thomas said he expected similar success from the Bonnaroo festival.

According to Thomas, another demand generator is that a number of businesses are located within close proximity to the property, including a Nissan power production facility. These businesses attract many foreign visitors.  Thomas stated that the hotels currently in the area near the property "aren't that great."  (R. 97, Jury Trial Transcript, PageID# 851.)  His plan, therefore, was to develop a higher-quality hotel, such as a Hilton Garden Inn, targeted to attract

these foreign visitors. Thomas also expected to attract visitors from the Arnold Air Force Base, which is located within three miles of the property and employs approximately 4,000 people.

Thomas testified that in his opinion, the highest and best use of the property is for a hotel. This opinion was partially based on the information Thomas received from a market research report about the hotel industry. Thomas explained that but for the presence of the power line, his property would be well suited for a hotel. Thomas explained why his property was no longer feasible for hotel development:

> Because [the power lines] are [a] hazard, they are dangerous, people can get hurt. And my perception is that if someone were to be hurt, either directly or consequentially from those power lines, I would be held liable or at least my property would have a significant diminution of value. It's a risk that as a business investor I would not make after the power lines went into position there.

(*Id.* at 846.)

Thomas also said that above-ground power lines are unattractive. He explained that it is important for a hotel to maintain an attractive visual appearance: "[O]ne of the things we spend a lot of time with the hotels is trying to make the environment as attractive as possible." (*Id.* at 844.)

Thomas acknowledged that the property would need to be rezoned to allow the development of a hotel: "I couldn't build a hotel without getting it rezoned." (*Id.* at 936.) Thomas also acknowledged that a hotel is not listed as a permitted or conditional use in the A-1 or C-1 zoning districts. Although Thomas stated that he thought the property could be rezoned to allow the development of a hotel, he testified that he had not actually sought a rezoning.

Bob York, a certified general appraiser, testified on behalf of the TVA as an expert regarding property values in the area. York also prepared an appraisal report in which he explained that a hotel would not be the highest and best use for the property. Rather, according to York, the highest and best use for the property is agriculture. York explained that it was not financially feasible to develop a hotel on the property:

> In this case I determined that it was -- there was -- there [were] so many reasons why you wouldn't want to develop the property at that time. Number one, there

was no sewer available.  The soils were -- were -- were questionable as far [as] percing.  The road frontage was not very -- there wasn't a whole lot of road frontage.  It was just a county road.  And there was probably a limited amount of water available.  So to intensely develop it commercially, it was going to take a zoning change, a lot of utilities put in, a lot of roadwork done.  It was just so much that it was not -- in my opinion was not financially feasible to do that.

(*Id.* at 994.)

Thomas did not testify as to the property's fair market value before and after the taking. Rather, he asked the jury to award him compensation based on the following:

Well, first of all, I'd like to be reimbursed the [$]50,000 plus that I've spent so far to defend myself in this case.  Secondly, I'd like to be paid the same as my parking a car at the airport or around the courthouse.  So I would say $15 a day to pay me for planting the poles and keeping the electricity going is quite reasonable. Thirdly, I'd like that index[ed] to [the] CPI, Consumer Pricing Index, so that when the municipality decides to double or triple my property taxes, that I would have a way, I would presume, that when they raise taxes, they would tie that into the Consumer Pricing Index and -- and I would like to have the possibility -- since this goes on for fifty hundred years, I'd like to have the possibility of continuing to get an increase.  So tie it to the -- to the average cost of a person living in the United States.

(*Id.* at 859-600.)

Thomas did not put on any other witnesses.  York, on the other hand, utilized the before-and-after method of valuation to determine the just compensation award to be paid to Thomas for the property taken.  York explained that under the before-and-after method, just compensation is the difference in the fair market value of the property immediately before the taking and the fair market value of the property remaining immediately after the taking.

York calculated a before value of $224,000.  He arrived at this number by taking the total number of acres—thirty-four—and multiplying by $6,000, a figure which represented York's assessed per acre value of this class of property in Coffee County.  York then added the revenue derived from the two pre-existing advertising billboards located within the easement—*i.e.*, $20,000—which resulted in a total value of $224,000.  York testified about the data upon which he relied in reaching his conclusions, including comparable sales of similar types of property.

York then devalued the land within the easement by seventy-five percent, arriving at an after value of $214,000.  This resulted in a total damage amount of $10,000.

Following the close of testimony, the TVA moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on the grounds that Thomas had not presented any evidence from which a reasonable jury could award just compensation in an amount greater than $10,000.  After hearing argument on the motion, the district court agreed with the TVA and granted its motion.  The district court then entered judgment awarding Thomas just compensation in the amount of $10,000.  Thomas now appeals the district court's ruling.  We discuss additional facts as necessary below.

## DISCUSSION

### I.  Exclusion of Thomas' Expert Witness

Thomas argues that the district court abused its discretion in excluding testimony by his expert witness.  "We review the exclusion of expert testimony for abuse of discretion, even when the exclusion results in the entry of summary judgment for the opposing party." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011) (citation and internal quotations omitted).  "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (citation and internal quotation marks omitted).

#### a.  *Inadmissibility Under Rule 702*

The starting point in this analysis is Rule 702, which governs the use of expert testimony. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The rule, which was amended in 2000, reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *See* Fed. R. Evid. 702 advisory comm. note, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").

Under Rule 702, "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528-29 (6th Cir. 2008) (quoting Fed. R. Evid. 702). The party offering the expert's testimony has the burden to prove by a preponderance of the evidence that the expert is qualified. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). We have also stated that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530 (internal quotation marks omitted). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation and internal quotation marks omitted).

Before applying these standards, we describe in more detail the proposed testimony at issue. Wilson's proposed testimony concerned the feasibility of constructing a hotel on the property. In his two-page expert report, Wilson stated that he has "worked with [Thomas] for over 6 years on the development, acquisition, renovation and operations of 4 hotels." (R. 47-1 at 182.) Wilson then explained that Thomas planned to develop a "limited service hotel" on the property due, at least in part, to the property's visibility from Interstate 24. *Id.* But according to Wilson, Thomas' plans were adversely affected by the TVA's construction of an above-ground power line across the property. As to how the power line would affect the feasibility of developing a hotel, Wilson stated:

The above ground Transmission[] lines as detailed in the December 2012 Final Environmental Assessment prepared by the TVA will materially and negatively impact the development, financing and ongoing operations of any first tier limited service hotel.

These types of power lines create both a visual and psychological barrier to guests thinking about staying at a hotel. The concern for safety of "how close is too close" for one's family can make it easy to just keep driving until the next exit . . . If the TVA had chosen to put the power lines underground, then the transmission lines would not have a negative effect on the development of a limited service hotel on the Property.

(*Id.* at 182-83.)

That was the extent of Wilson's report. The district court excluded Wilson's testimony for two main reasons. First, the court found that the proposed testimony provided no basis for the jury to conclude that there was any reasonable probability that the property could be rezoned for commercial purposes, or that there was a market for a hotel. Second, the court found that the proposed testimony offered no assessment of the property's before and after value.

We have consistently held that in condemnation cases, "speculative and remote possibilities cannot become a guide for the ascertainment of value," especially when the creation of such a potential use would require a substantial investment of capital. *United States v. 1,291.83 Acres of Land*, 411 F.2d 1081, 1084 (6th Cir. 1969). A landowner in the position of Thomas "must show that a market [for the proposed use] in fact existed on the date of taking or would be reasonably likely to exist in the near future. That is, the mere physical adaptability of the property is insufficient to discharge the burden of proving the existence of a market." *Id.* at 1085. Accordingly, where the landowner's expert testimony amounts to "mere guess or speculation," the trial court should exclude the testimony. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993).

We considered an analogous issue of whether the landowner's expert testimony amounted to speculation in *United States v. 47.3096 Acres of Land*, 583 F.2d 270 (6th Cir. 1978). In that case, the government appealed from an adverse jury verdict awarding the landowner $77,000 for the taking of 47.3096 acres from a 76.7588 acre tract of farmland. *Id.* at 271. The sole question on appeal was whether the trial court properly admitted the testimony of the

landowner's expert witness, who estimated the value of the property based on its hypothetical worth as a residential subdivision. *Id.* The expert witness testified that at the time of condemnation, the landowner's property could have been divided up into several residential lots of varying sizes. *Id.* Using comparable area sales, the expert witness testified as to what each lot would have sold for. *Id.* The trial court denied the government's motion to strike that testimony. *Id.*

On appeal, we reversed the trial court's judgment and remanded for a new trial. *Id.* at 272-73. We found that the expert's testimony as to what each lot would have sold for was purely speculative and not based upon anything tangible. *Id.* at 272. For example, the expert's testimony "offered no evidence that the property was 'needed or likely to be needed in the reasonably near future' for residential subdivision." *Id.* (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)). Nor did the testimony offer any evidence "of any current demand or potential for subdivisions in the neighborhood," or any evidence that the landowner "had a plan to subdivide" the property. *Id.* (citation and internal quotations omitted). Thus, the expert's testimony should not have been admitted because what he testified to was not "fairly shown to be reasonably probable." *Id.* (citation and internal quotations omitted).

Based on the case law, we find no abuse of discretion in the district court's exclusion of Wilson's proposed testimony. Like the testimony admitted in *47.3096 Acres of Land*, Wilson's proposed testimony was purely speculative and not based upon any actually observed data. His expert report did not present any supporting evidence to show that the existence of above-ground power lines on the property renders the development of a hotel financially unfeasible. As the district court correctly noted, Wilson's expert report did not offer evidence showing the market demand for a hotel, nor did it provide any analysis as to whether or not Thomas' proposed development was even feasible. Wilson simply stated that hotel guests would be turned off by the aesthetic impact of a power line.

Moreover, nowhere in Wilson's statement was there any mention of whether Coffee County would approve a rezoning, variance, or permits for commercial development on this property. Nor was there evidence that such variances had been permitted with respect to similarly zoned parcels in the past. As the district court noted, the property "is currently zoned

for agricultural use" and Wilson's statement "provides no basis for the jury to conclude that, absent the transmission lines, there is a reasonable future probability to conclude that Mr. Thomas' property could be rezoned for commercial use and that it could successfully be developed for placement of a tier one, limited use service hotel." (R. 75, District Court's Order, PageID# 477.) Similarly, Wilson had not reviewed or identified any document showing that the development of a hotel was ever permitted in land in Coffee County that is zoned A-1, *i.e.*, agricultural-residential zoning. *See, e.g.*, *Rockies Express Pipeline, LLC v. Burtle*, 492 F. App'x 666, 670 (7th Cir. 2012) (excluding the landowner's proffered expert testimony because the expert "speculated that the highest and best use of the landowners' properties was for commercial or residential use, even though the properties were only zoned and used for agricultural purposes"); *United States v. 33.92356 Acres Of Land*, 585 F.3d 1, 7-8 (1st Cir. 2009) (excluding the landowner's proffered expert testimony because the expert could not show a reasonable probability that the property would be rezoned).

We find that the district court acted well within its discretion in excluding Wilson's testimony. The support for Wilson's opinion was sufficiently sparse such that the court did not abuse its discretion in holding that the proposed expert testimony did not meet the standards of Rule 702, or the standards for admissibility in the context of condemnation proceedings.

### b. *Inadmissibility Under Rule 37(c)(1)*

The district court also excluded Wilson's testimony because his expert report failed to comply with Rule 26(a)(2)(B), which requires that expert reports be detailed and complete. Therefore, the district court determined, Wilson's report and testimony was prohibited by Federal Rule of Civil Procedure 37(c)(1). Although the TVA raised this argument in its motion to exclude Wilson's testimony, Thomas did not respond to this argument below, nor does he address the issue in his brief on appeal. Therefore, Thomas has waived his right to challenge the district court's ruling in this regard. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[A]n argument not raised before the district court is waived on appeal to this Court."); *Middlebrook v. City of Bartlett*, 103 F. App'x 560, 562 (6th Cir. 2004) ("The failure to present an argument in an appellate brief waives appellate review.") (citation omitted).

But even if Thomas had not waived his challenge to this ruling, we would still affirm the district court's decision. Wilson's two-page report did not meet Rule 26(a)(2)(B)(i)'s requirement that an expert report be "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The district court in this case specifically discussed Wilson's failure, in violation of Rule 26(a)(2)(B)(i), to give "a complete statement of all opinions the witness will express and the basis and reasons for them." Wilson provided no support for his opinion that the existence of above-ground power lines on the property would "materially and negatively impact the development" of a hotel, or that their very existence would "create both a visual and psychological barrier to guests thinking about staying at a hotel." (R. 47-1 at 182-83.) Without more explanation of how Wilson came to this conclusion, his report does not satisfy the requirements of Rule 26(a).

As we have previously held, "Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Vance ex rel. Hammons v. United States*, 182 F.3d 920, at *3 (6th Cir. 1999) (table)). Additionally, the burden is on the potentially sanctioned party to show harmlessness. *Id.*

Because Wilson's expert report did not satisfy Rule 26(a) and Thomas did not meet his burden of showing that the error was justified or harmless, the district court did not abuse its discretion in excluding Wilson's report and testimony. Wilson's testimony was therefore inadmissible under Rule 37(c)(1), and, as discussed above, for failing to meet the requirements of Rule 702.

**II.     Exclusion of Thomas' Highest and Best Use Evidence**

Thomas also argues that the district court erred by excluding his highest and best use evidence.  "Evidentiary rulings are generally reviewed for an abuse of discretion."  *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 240 (6th Cir. 2010) (citation omitted).  This standard is no less applicable to condemnation proceedings, where, "other than the precise issue of the amount of compensation to be awarded[,] . . . it is for the judge to tell the jury the criteria it must follow in determining what amounts will constitute just compensation."  *United States v. Reynolds*, 397 U.S. 14, 20 (1970).

"The trial judge must make a preliminary determination that there is factual support for a finding by the jury that the property is adaptable and needed or likely to be needed in the reasonably near future for the proposed use."  *United States v. 478.34 Acres of Land, Tract No. 400*, 578 F.2d 156, 159-60 (6th Cir. 1978) (internal quotation marks omitted).  Accordingly, questions regarding the admissibility of this sort of evidence are left to the district court's discretion.  *See, e.g., United States v. 27.93 Acres of Land*, 924 F.2d 506, 512 (3d Cir. 1991).  Therefore, like other evidentiary rulings, we review a district court's decision regarding the admissibility of highest and best use evidence for abuse of discretion.  *See id.* (applying the abuse of discretion standard).

### a.   Highest and Best Use Doctrine

Under eminent domain, the government can take private property for public use upon the payment of just compensation to the owner.  *United States ex rel. Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 278-80 (1943).  The determination of just compensation involves the land's market value as determined by the "highest and best use" test.  *See Olson*, 292 U.S. at 255.  "Highest and best use" is a term of art.  The term refers to "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future" and may be considered in establishing market value.  *Id.*

In condemnation proceedings, the trier of fact can only consider alternative uses for which the land can reasonably be developed in the near future; the mere possibility of a more profitable use may not be considered.  *See United States v. 320.0 Acres of Land*, 605 F.2d 762,

814 (5th Cir. 1979) ("The principle that just compensation cannot be predicated upon potential uses which are speculative and conjectural is of course firmly established."). This limitation ensures that the landowner is put in as good a position as he would have occupied if his property had not been taken, but that he does not profit from the condemnation. *See Olson*, 292 U.S. at 255, 257 (the landowner "must be made whole but is not entitled to more"). The property's current use is presumed to be its highest and best use. *L.E. Cooke Co.*, 991 F.2d at 341.

### b. Admissibility of Highest and Best Use Evidence

Federal Rule of Civil Procedure 71.1(h)(1) mandated that the district court screen the proffered commercial use to determine whether Thomas had demonstrated that a commercial use of the condemned tract was practicable and reasonably probable. *See Reynolds*, 397 U.S. at 19 (stating that the rule "provides that, except for the single issue of just compensation, the trial judge is to decide all issues, legal and factual, that may be presented").

Because the district court concluded that Thomas' proffered commercial use was not reasonably probable, it excluded from jury consideration any evidence whose admissibility depended upon the property having such use. The court's ruling was based on the fact that Thomas did not present any evidence as to the market demand for a hotel, and also because there was no evidence that the property could be rezoned for commercial purposes. Thomas now appeals that ruling. He argues that he introduced sufficient evidence for a jury to conclude that there was a reasonable probability that his property would be rezoned commercial.

The Supreme Court's ruling in *Olson*, while not a bright line rule, provides that a proposed "use" requires a showing of reasonable probability that the land is both physically adaptable for such use and that there is a demand for such use in the reasonably near future. *Olson*, 292 U.S. at 255-57.

### i. Rezoning Probability

Under *Olson's* first prong, we must first determine whether Thomas established that his proffered use of the property was reasonably probable so as to avoid speculation and conjecture. The First Circuit considered an analogous situation in *33.92356 Acres Of Land*, *supra*. In that

case, a landowner appealed from an assessment of damages resulting from the government's condemnation of approximately 34 acres of land. 585 F.3d at 3. The 34-acre parcel was zoned for conservation and passive recreation purposes. *Id.* No other uses were permitted without a variance or permit. *Id.* at 3-4. At the time of the taking, the government deposited $375,300 with the district court as estimated just compensation. *Id.* at 4. This estimate was based on a highest and best use of the property for conservation and passive recreation. *Id.* The landowner, on the other hand, retained an expert who would testify that the highest and best use of the parcel was for the construction of residences and sand extraction. *Id.* However, neither use was permissible under the zoning ordinance, absent permission from the zoning board. *Id.*

Before trial, the district court had granted the government's motion in limine to exclude the expert's testimony. *Id.* at 5. The district court adopted the magistrate judge's report and recommendation, which concluded that the expert's "opinion, by itself, fails to establish a reasonable probability that the Planning Board would either change the zoning or grant a variance at any time in the near future." *Id.* (citations and quotations omitted). The report further noted that the landowner "has failed to document a single instance that supports [the expert's] assertion that the Puerto Rico Planning Board has ever, or is likely to, approve residential housing developments on land zoned [for conservation and passive recreation purposes]." *Id.*

On appeal, the First Circuit affirmed the district court's exclusion of the landowner's highest and best use evidence. *Id.* at 8-9. As an initial matter, the court found that because the landowner conceded that the 34 acres could not be used for residential development or sand extraction without rezoning or the authorization of a variance, the landowner had the burden to show that "there is a reasonable probability that the property would be rezoned or that a variance could have been obtained in the near future." *Id.* at 8. However, the court found that the landowner did not meet his burden. *Id.* The court noted that the landowner had not spoken to anyone at the zoning board and had not made any showing that the board "would approve a rezoning, variance, or permits for residential development or sand extraction on this land." *Id.* Additionally, the landowner did not present any evidence that sand extraction was ever permitted

on the land. *Id.* As a result, the court concluded, the "district court was clearly within its discretion to exclude" the landowner's proffered evidence. *Id.* at 9.

The district court's factual findings in this case, like the court in *33.92356 Acres Of Land*, adequately supported its determination that Thomas had not carried his burden. As the district court found, Thomas did not show any reasonable probability that the property could be rezoned for commercial use. The uncontested evidence presented at trial established that most of the property is zoned for agricultural-residential purposes, with only a smaller portion being zoned as rural center district. As the landowner, Thomas had the burden of showing that the property "is adaptable and needed or likely to be needed in the reasonably near future" for commercial use. *Olson*, 292 U.S. at 255. In other words, Thomas had the burden of showing that the property could be rezoned to allow for commercial uses. Yet, Thomas did not present any evidence whatsoever suggesting that Coffee County would approve a rezoning, variance, or permits for commercial development on the property. Nor was any evidence presented that such variances had been permitted with respect to similarly zoned parcels in the past.

Just like the landowner in *33.92356 Acres Of Land*, Thomas himself acknowledged that the property would need to be rezoned to allow the development of a hotel. And Thomas also acknowledged that a hotel is not listed as a permitted or conditional use in the A-1 or C-1 zoning districts. Although Thomas stated that he thought the property could be rezoned to allow the development of a hotel, he testified that he had not actually sought a rezoning. Thomas even acknowledged that he had not shown that a zoning change was reasonably probable in the future. Based on all of this evidence, we conclude that Thomas failed to show, by a preponderance of evidence, that a jury could find that there was a reasonable probability that the property would be rezoned commercial. Therefore, the district court did not err in declining to submit this issue to the jury.

### ii. Future Market Demand

The district court also found that Thomas did not offer evidence showing the market demand for a hotel. As we have stated previously, "it is generally accepted that there must be demonstrated an actual profitable use or a market demand for the prospective use." *United*

*States ex rel. TVA v. Easement & Right of Way 100 Feet Wide*, 447 F.2d 1317, 1319 (6th Cir. 1971) (citation omitted).

This question presents somewhat of a closer call because Thomas did testify about the future market demand for a hotel. Thomas testified that his property is optimally located for a hotel because it would draw customers from the nearby Bonnaroo festival and also from the several businesses located within close proximity to his property. The district court found Thomas' evidence about the future market for a hotel speculative, in part because Thomas did not show that he had been in contact with any sort of hotel chain. The court's ruling primarily focused on the fact that Thomas did not present evidence that the property could be rezoned to allow the development of a hotel—the court did not offer much in the way of whether Thomas established a future market demand for a hotel.

We found very few cases discussing what a landowner like Thomas must show to prove the existence of a market demand for something. Perhaps the closest case on the facts is *United States v. 341.45 Acres of Land*, 633 F.2d 108 (8th Cir. 1980). There, the landowner attempted to introduce evidence about the demand for condominiums in the area. *Id.* at 109-10. The district court admitted the evidence over the government's objection. *Id.* at 110. On appeal, the Eighth Circuit found that the district court erred in admitting this evidence. *Id.* at 112-13. As an initial matter, the court noted that under *Olson*, "physical adaptability of the land to a proposed use does not end the inquiry. The landowners are also required to introduce credible evidence that there is or will be a demand for the proposed use in the reasonably near future." *Id.* at 112. The court then summarized the evidence brought forward by the landowner:

> Hawkinson testified, at length, about the suitability of the Essling land for development of 24 condominium units. However, on cross-examination Hawkinson admitted that he did not know of any condominiums in northern Minnesota that did not have road access. He also stated that there were no condominiums in Voyageurs National Park. Hawkinson identified, by name, two areas in northern Minnesota which have been developed with condominiums having road access. However, on cross-examination Hawkinson admitted that these condominiums were located around skiing areas. Hawkinson testified that the Essling land was an ideal location for a condominium and stated that he felt "it would go over wonderful because it's the first of its kind."

*Id.* at 112-13.

The court characterized the landowner's testimony as "lack[ing] [ ] credible evidence of a demand for the proposed use in the reasonably near future," reasoning that "[t]here must be some objective support for the future demand, including volume and duration." *Id.* at 113 (citation and internal quotation marks omitted).  The court also reasoned that "[v]alue implies demand and a buyer" and that the landowner's "testimony assumed both." *Id.* (citation and internal quotation marks omitted).  As a result, the court reversed the district court's ruling and remanded the case for a new trial. *Id.* at 114.

There are certainly parallels between Thomas' situation and that presented in *341.45 Acres of Land*.  Thomas testified about what he thought were demand generators for a hotel, but did not supply any objective evidence substantiating his market demand analysis.  Thomas simply did not do some of the things that one would expect a person in his position to do—*e.g.*, engage in any sort of preliminary discussions with a prospective hotel chain, present market studies showing a sufficient demand for a hotel, or show market sales of land for hotel development purposes.  On the facts presented, it is difficult to conclude that the district court erred in finding speculative Thomas' market demand analysis—especially when applying an abuse of discretion standard of review.

The fact remains though that Thomas, who bore the burden of proof, did not overcome the presumption that the highest and best use of the property was its existing use as agricultural land.  The property is zoned mainly for agricultural use and Thomas continued to use the property for agricultural purposes after closing on its sale.  This evidence overwhelmingly supported the district court's decision to exclude from jury consideration any evidence whose admissibility depended upon the property having commercial use.

## III.    Judgment as a Matter of Law

Finally, Thomas challenges the district court's grant of judgment as a matter of law to the TVA.  We review *de novo* a district court's grant of judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. *Culver v. CCL Label, Inc.*, 455 F. App'x 625, 627 (6th Cir. 2012).  Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally

sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). We will uphold a grant of judgment as a matter of law "where, when viewed in the light of those inferences most favorable to the nonmovant, there is either complete absence of proof on the issues or no controverted issues of fact upon which reasonable persons could differ." *Culver*, 455 F. App'x at 627 (citation and internal quotations omitted).

### a. *Just Compensation*

The sole issue at trial was just compensation for the land taken. The Supreme Court has defined just compensation to mean the fair market value of the property on the date of the taking. *United States v. Miller*, 317 U.S. 369, 373-74 (1943). It is the landowner's burden to prove, by a preponderance of the evidence, what amount constitutes just compensation. *Powelson*, 319 U.S. at 273-74.

It is well established that in a partial takings case such as this, "[t]he correct measure of compensation for an easement, as for any partial taking, is the difference in fair market value of the whole tract before and after the taking." *United States of America ex rel. TVA v. Easements and Rights of Way over 6 Acres of Land*, 117 F. App'x 422, 423 (6th Cir. 2004) (citing *United States v. 2,847.58 Acres*, 529 F.2d 682, 686 (6th Cir. 1976)). For example, in *United States v. Virginia Electric & Power Co.*, a partial takings case involving an easement, the Supreme Court stated that the district court "adopted an acceptable method of appraisal, indeed the conventional method, in valuing what was acquired by the Government by taking the difference between the value of the property before and after the Government's easement was imposed." 365 U.S. 624, 632 (1961). Similarly, in *United States v. Grizzard*, the Supreme Court affirmed a compensation award of $1,500 after finding that "the whole land was worth $3,000 before said taking, and what was left after the taking was worth $1,500." 219 U.S. 180, 182 (1911).

The before-and-after method has also been widely adopted by other circuits. *See, e.g., 33.92356 Acres Of Land*, 585 F.3d at 9 (collecting cases employing the before-and-after method and concluding that the method "is particularly advantageous where either it is difficult to value fairly the condemned tract as a separate parcel or one of the parties contends that the remainder was harmed or benefitted by the condemnation"); *United States v. 8.41 Acres of Land*, 680 F.2d

388, 392 (5th Cir. 1982) ("Federal courts have long held that an appropriate measure of damages in a partial-taking case is the difference between the value of the parent tract before the taking and its value after the taking.").

### b.  The Evidence at Trial

We have little difficulty concluding that the district court correctly entered judgment as a matter of law, and the reason for this is simple—Thomas presented no evidence at all about the value of his property before and after the taking of the condemned portion.  The TVA, on the other hand, explained how it used the before-and-after method to calculate the $10,000 award of just compensation owed to Thomas.  Unlike the TVA, Thomas did not introduce any market or comparable sales data, which we have previously said is the best evidence of market value.  *See, e.g., Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir. 1939) ("Sales at arm[']s length of similar property are the best evidence of market value."); *see also United States ex rel. TVA v. Easement and Right of Way*, 405 F.2d 305, 308 (6th Cir. 1968) ("[W]here witnesses do not base their opinions on sales of the most similar property, their opinions have slight probative value."). Nor did Thomas make any attempt to offer evidence about the difference in value between his property before and after the TVA's taking.  Instead, he told the jury that he should be reimbursed for his attorney's fees and paid $15 per day.  This is hardly the kind of evidence that is required to show just compensation.

Without any evidence as to the value of Thomas' property before and after the taking, the jury would have been left guessing the correct amount to compensate Thomas for his loss.  We would be stretching beyond all precedent to find that Thomas carried his burden of proof.  The district court therefore properly withheld from the jury any issue as to the amount of just compensation owed to Thomas.

### c.  Thomas' "Estimated Just Compensation" Argument

In federal condemnation actions, when a declaration of taking is filed along with the complaint, a deposit of estimated compensation must be made with the court when required by law.  *See* Fed. R. Civ. P. 71.1(j)(1) ("The plaintiff must deposit with the court any money required by law as a condition to the exercise of eminent domain and may make a deposit when

allowed by statute."). In this case, the TVA did exactly that—at the time of the taking, it deposited $15,500 with the district court as estimated just compensation.

On appeal, Thomas argues that the district court "improperly awarded just compensation of only $10,000, which was less than the estimated just compensation ($15,500) that had been deposited with the Court at the time of filing the Complaint." Def.'s Br. at 16. But as the TVA correctly points out, Thomas did not offer any evidence that the TVA's $15,500 estimated just compensation deposit was in fact the value of Thomas' property before and after the taking.

But even had Thomas offered proof of the TVA's estimate, that estimate alone is meaningless to the issue of just compensation. *See, e.g.*, *Miller*, 317 U.S. at 381 ("The payment is of estimated compensation; it is intended as a provisional and not a final settlement with the owner; it is a payment 'on account of' compensation and not a final settlement of the amount due."); *Evans v. United States*, 326 F.2d 827, 829 (8th Cir. 1964) ("The deposit of estimated compensation by the government is no evidence of value and has no bearing whatsoever on value.") (citations and internal quotation marks omitted); *United States v. Catlin*, 142 F.2d 781, 784 (7th Cir. 1944) (stating that the government's estimate of the value of the property taken "is merely tentative," and that "the amount awarded may be increased or decreased by final judgment."). We therefore reject this argument.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment.