RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CORNING PLACE OHIO, LLC; CORNING PLACE OHIO INVESTMENT, LLC; TAX MATTERS PARTNER,
      *Petitioners-Appellants*,

   *v.*

COMMISSIONER OF INTERNAL REVENUE,
      *Respondent-Appellee*.

No. 25-1093

─────────────

On Appeal from the United States Tax Court.
No. 12428-20—Albert G. Lauber, Judge.

Argued: October 22, 2025

Decided and Filed: November 5, 2025

Before: SUTTON, Chief Judge; BATCHELDER and LARSEN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** G. Karl Fanter, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants. Samuel P. Jones, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** G. Karl Fanter, Sam A. Camardo, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellants. Samuel P. Jones, Jennifer M. Rubin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────

## OPINION

─────────────

SUTTON, Chief Judge. In 2016, Corning Place paid $6 million to buy the Garfield Building, an eleven-floor, nineteenth-century property in downtown Cleveland. Sixteen months later, it created an "Historic Preservation and Conservation Easement," which would donate the

right to modify the façade and to increase the Garfield's height (by 34 floors) to a local charity. Corning Place claimed a $22 million tax deduction for that donation, nearly four times what it had paid for the building. The Internal Revenue Service disallowed the deduction and imposed penalties. It found that Corning Place claimed the deduction for the wrong year, substantially overvalued its worth, and failed to document key expenses. Corning Place challenged the disallowance and penalties in Tax Court. The Tax Court agreed with the IRS. We do too and affirm.

I.

The Garfield lies in the heart of downtown Cleveland. Built in 1893 and standing 11-stories tall, it represents an early example of steel-framed skyscrapers in the Chicago School architectural style.

In November 2014, Corning Place was formed to purchase and develop the Garfield. It is a partnership, and its primary partner is Corning Place Investment (Investment).

In January 2015, Corning Place purchased the Garfield for $6 million. An appraiser gave it the same value two months earlier, and Corning Place described the sale as "at market," "arm's length," and "reasonable." App'x 39.

Corning Place sought to leverage this investment in two ways. In October 2015, it redeveloped the Garfield from a bank office to a residential apartment building. It financed the development through $9 million in state and federal historical preservation credits. To secure the credits, Corning Place promised that "[n]one of the proposed rooftop construction . . . will be visible at ground level." App'x 37 (quotation omitted). The redeveloped Garfield remained 11-stories tall, and it now holds 123 apartments.

Then, in May 2016, Corning Place donated an "Historic Preservation and Conservation Easement" for the Garfield to a local charity as a potential tax-saving device. App'x 18. Although a taxpayer normally may not take a charitable deduction for the donation of a partial property interest, it may deduct the value of a "qualified conservation contribution." 28 U.S.C. § 170(f)(3)(A)–(B). Such "conservation easements" limit future development that would affect

the historical character of the building, including its façade.  *See Hoffman Props. II, LP v. Comm'r*, 956 F.3d 832, 833 (6th Cir. 2020).  The taxpayer may then deduct what it gave up, what amounts to the lost development opportunity created by the conservation easement.  *See id.*

Corning Place hired Sandvick Architects and appraiser Claud Clark to value an easement that prevented any development of the Garfield that would "materially and adversely affect [its] façade."  App'x 42–43.  They returned with a vision of what the Garfield could become:  a 45-story tower with 547 apartment units.  Such a redevelopment, they said, would require adding 34 stories to the century-old Garfield, inserting 40+ steel support pillars throughout the building, and excavating 130 feet below ground level to buttress the bedrock with cement pads.

The plans valued the Garfield's lost development potential at $22,601,000.  The feasibility analysis for the foundation relied on a general survey of buildings in downtown Cleveland rather than the Garfield itself.  The timeline assumed instant regulatory approval, occupancy within eight months of breaking ground, and no delays due to financing or construction difficulties.  Sandvick, which had also drawn up plans for the actual redevelopment, noted that it "would not be willing to assist" with construction of the 45-story tower because that would violate the terms of the existing five-year historical preservation credits.  App'x 506–07.

Corning Place reported a charitable donation deduction for the Garfield easement and a deduction for its easement-related expenses on its 2016 tax return.  The return reflected Corning Place's changing partnership structure.  All but one of Corning Place's partners had surrendered their membership interests as of May 18, 2016, leaving Investment as the sole owner.  Investment remained the sole partner through July 6, 2016, when a new investor bought into Corning Place.  For those seven weeks, Corning Place was not a taxable partnership, as it had only one partner, Investment.  Corning Place's 2016 taxable year thus began on July 7 and ended on December 31.

In August 2018, the Commissioner of the Internal Revenue Service told Corning Place that he was examining its 2016 return.  In July 2020, the Commissioner disallowed Corning Place's charitable-donation and easement-expense deductions for the 2016 return.  The Commissioner explained that Corning Place claimed the charitable donation in the wrong tax

year, overstated the deduction's value, and failed to adequately document its expenses.  The Commissioner imposed a 20% negligence penalty for claiming the easement in the wrong year, a 40% penalty for grossly overstating the easement's value, and a 20% negligence penalty for inadequate documentation of expenses.  All of this generated a total penalty of $8,993,400.

Corning Place and Investment challenged the Commissioner's decision in Tax Court. The Tax Court conducted a trial and agreed with the Commissioner.  It ruled that Corning Place claimed the deductions for the wrong year, reasoning that Investment was the only relevant partner at the time of the deductions.  It rejected Corning Place's valuation of the easement, finding an overstatement of 2400%.  It rejected Corning Place's belated documentation for its easement expenses.  And it rejected Corning Place's challenge to the penalties.

## II.

A partnership does not pay federal income taxes.  *United States v. Woods*, 571 U.S. 31, 38 (2013).  It instead reports its partners' distributable share of taxable income, gain, loss, deduction, or credit, what the Tax Code calls "partnership items."  26 U.S.C. §§ 701–06; *see also id.* § 6221.  The partners then account for those shares and pay any taxes due on their individual federal income tax returns. *Id.* § 706.

If the Commissioner disagrees with a partnership's report, he notifies its partners of any adjustments to partnership items, including penalties assessed on the partnership.  26 U.S.C. § 6223(a)(2).  (All citations, by the way, refer to the Internal Revenue Code as of 2016.)  The partners may seek judicial review in a partnership-level proceeding in the Tax Court.  *Id.* § 6226(a)–(b).  Once the adjustments to partnership items become final, the Commissioner proceeds against the individual partners if they owe more taxes. *Id.* §§ 6230–31.

At stake in today's appeal is (1) whether Corning Place may claim a partnership-level deduction for the Garfield easement, (2) whether Corning Place overstated the easement's value, (3) whether Corning Place properly documented its easement-related expenses, and (4) whether the Commissioner properly imposed underpayment penalties.  Corning Place bears the burden of showing that it deserves a deduction. *Kerman v. Comm'r*, 713 F.3d 849, 864 (6th Cir. 2013).  In

assessing the Tax Court's decision, we give clear-error review to its factual findings and fresh review to its legal conclusions. *Alioto v. Comm'r*, 699 F.3d 948, 952 (6th Cir. 2012).

A.

May Corning Place claim a charitable deduction for the Garfield easement in its 2016 tax return?

A taxpayer may deduct a charitable donation for the taxable year in which it made the donation. 26 U.S.C. § 170(a). And a partnership's taxable year includes only the portion of the year in which it has multiple partners. 26 C.F.R. §§ 301.7701-3(b)(1)(ii), -3(f)(2). When the partnership has only one partner, the partner must claim all partnership items, including deductions, on its own tax return. *Id.*; *see also id.* § 301.7702-2(a).

Corning Place donated the Garfield easement on May 25, 2016. But Corning Place's taxable year did not begin until July 7, 2016. Investment had become its sole partner on May 15, 2016, and remained its sole partner until July 7. For that roughly seven-week period, Corning Place did not exist as a taxable partnership. The correct taxpayer with respect to the deduction thus was Investment, not Corning Place.

All of this shows that Corning Place erred in claiming the deduction in its 2016 return. The return acknowledged that its taxable year began on July 7, the day it sprang back into existence as a taxable partnership. Yet the tax return still tried to claim a deduction for a donation made on May 25. Corning Place does not deny, indeed accepts, this reporting mistake. Appellant's Br. 11.

Yet Corning Place nonetheless offers two reasons why we should permit the deduction anyway. It first argues that the Tax Court should have ignored the mistake as a harmless administrative error. Corning Place points out that Investment also claimed a 100% share of the $22 million deduction for the charitable easement on its 2016 tax return. Had all gone as the Tax Code directed, Investment would have directly claimed the deduction on its 2016 tax return. What difference does it make, Corning Place asks, when "the *same* charitable deduction in the

*same* amount from the *same* period [was] allocated to the *same* taxpayer in the *same* proportions"?  Reply Br. 4.

To restate the question, however, answers the point.  The question is whether *Corning Place* may claim the deduction for a period of time that its tax year did not cover.  That Investment may be able to claim some deduction for a charitable donation during that seven-week period speaks to any future partner-level tax proceedings, not to the propriety of Corning Place's return.  *Woods*, 571 U.S. at 40–42.  The partner-level tax return of Investment, in short, does not affect what partnership-level deduction Corning Place may claim.

Corning Place worries that this approach places "form over substance."  Reply Br. 4.  But "form" *is* "substance" when it comes to law.  "The words of law (its form) determine content (its substance)."  *Summa Holdings v. Comm'r*, 848 F.3d 779, 782 (6th Cir. 2017).  The Tax Code does not permit taxpayers to take deductions in the wrong year under the wrong category.  *Crosley Corp. v. United States*, 229 F.2d 376, 379 (6th Cir. 1956).  In the last analysis, the Tax Code does not permit a taxpayer to take a deduction in the wrong year as the wrong entity unless it files a timely correction.

That leads to Corning Place's second argument—that Investment cured the error in September 2020 by submitting an amended return for 2016 that claimed the deduction for itself.  This argument runs into a different problem.  A partnership, it is true, may fix a mistaken filing by submitting a "request for an administrative adjustment."  26 U.S.C. § 6227(a); 26 CFR § 301.6227(c)-1.  But the Tax Code sets a deadline.  Section 6227 requires the partnership to correct a filing *before* the Commissioner notifies its partners of a proposed adjustment.  26 U.S.C. § 6227(c).  The Commissioner notified Corning Place and Investment of its examination of Corning Place's 2016 return in August 2018.  Even so, Investment did not submit its corrected return until September 2020, after the Commissioner notified Investment in July 2020 of the proposed adjustment and long after it notified the partnerships about the audit.  Investment thus submitted its corrected return two months too late—and two years after the Commissioner announced its investigation.  As the return was untimely, we need not decide whether Investment's submission factually included the correct documents or whether those documents sufficed to make a proper adjustment.

Because Corning Place improperly claimed a deduction that belonged to another taxpayer and no one corrected the mistake in a timely way, the Tax Court legitimately denied the deduction.

B.

Did Corning Place overstate its easement deduction?

Although Corning Place may not claim a deduction for its easement donation, the size of any tax penalty turns on the value of the easement. The Tax Code delegates the choice of how to value the easement to the Treasury Secretary. *See* 26 U.S.C. §§ 170, 7805. The relevant regulations provide that a taxpayer may deduct the "fair market value" of the donated easement "at the time" of the donation. 26 C.F.R. § 1.170A-14(h)(3)(i). If a sales record of comparable easements exists, the value of the donated easement equals the general market price of those easements. *Id.* If a sales record does not exist, as here, the value of the donated easement "equal[s] . . . the difference between the fair market value of the [encumbered] property . . . *before* the granting of the restriction and the fair market value . . . *after* the granting of the restriction." *Id.* (emphases added).

Before-and-after valuation identifies the delta, if any, between the value of the property without the easement and with it. In making this assessment, the owner's estimates of the value of any conservation easement must be grounded in economic realities, not pies in the sky. In the words of the relevant regulation, "the fair market value of the property before contribution of the conservation restriction must take into account not only the current use of the property but also an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed, as well as any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use." 26 C.F.R. § 1.170A-14(h)(3)(ii). In related valuation settings, a property's fair market value turns on the "most profitable use for which [it] is adaptable and needed or likely to be needed in the reasonably near future" and "exclude[s] from consideration . . . mere speculation and conjecture." *Olson v. United States*, 292 U.S. 246, 255, 257 (1934). We start with the assumption that the current use amounts to its best use. *United States ex rel. Tenn. Valley Auth.*

*v. 1.72 Acres of Land in Tenn.*, 821 F.3d 742, 752–53 (6th Cir. 2016); *United States v. L.E. Cooke Co.*, 991 F.2d 336, 341 (6th Cir. 1993). Because Corning Place proposed a hypothetical use, it must show that such use rests on a "reasonable probability" rather than "mere possibility." *1.72 Acres of Land*, 821 F.3d at 752.

The Tax Court did not err, let alone clearly err, in rejecting a valuation premised on a 34-story addition to the Garfield. The Tax Court appropriately asked whether transforming the 11-story, century-old Garfield into a 45-story apartment tower was "physically possible, appropriately supported, and financially feasible." App'x 64 (quotation omitted); *see also* Appraisal Inst., *The Appraisal of Real Estate* 277–78 (13th ed. 2008) (same). It rejected the easement proposal for several straightforward reasons.

Corning Place offered exceedingly weak underlying analyses to support the physical possibility of this proposed construction. Its structural analysis was labeled "not [to] be used for actual construction," and a soil survey based on a different building amounted to weak support for the physical possibility of this proposed building. App'x 613. Making matters worse, Corning Place was unwilling to put a live person in front of the Tax Court to explain its analysis. All it offered were feasibility analyses that turned on inadmissible hearsay. *See Alioto*, 699 F.3d at 954. On this record, any "objective assessment of how immediate or remote the likelihood" that the property would be developed in this way, 26 C.F.R. § 1.170A-14(h)(3)(ii), falls on the "remote" side of the scale.

The likelihood of regulatory approval for this proposed construction also falls on the remote side of the line. What government body would approve such an audacious plan without a sound feasibility analysis? Plus, any legitimate proposal would have to account for "any effect from zoning, conservation, or historic preservation laws that already restrict the property's potential highest and best use." 26 C.F.R. § 1.170A-14(h)(3)(ii). Just as a Cleveland homeowner living in a residentially zoned suburb could not claim a deduction for declining to build a ten-story office tower, so the owner of an office building may not claim a deduction for declining to immediately add an addition that was incompatible with an existing five-year historic-preservation law. *See* 26 U.S.C. §§ 47(b), 50(a).

Corning Place also did not establish unmet market demand to support a 34-story addition to a century-old frame. While it identified several "vertical expansions" in downtown Cleveland, each of them came atop a foundation recently built with that expansion in mind. App'x 1076, 1936, 3120–21. Far from supporting Corning Place's plan to transform the Garfield, these comparisons show what a legitimate request might look like and, at all events, show "no shortage of alternative development sites" that could meet market demand at a far lower cost. App'x 936.

Corning Place also never justified its construction-costs estimate. It tried to prove costs with a one-page consultant report declaring, without any support, that the 34-story expansion would require $102 million. But this assessment, which included not only adding 34 stories but also inserting 40+ steel support pillars throughout a century-old building, was patently speculative, as the Tax Court fairly concluded. "[S]peculative and remote possibilities cannot become a guide for the ascertainment of value, especially when the creation of such a potential use would require a substantial investment of capital." *1.72 Acres of Land*, 821 F.3d at 749–50 (quotation omitted).

Corning Place resists this conclusion on several grounds. It argues that the Tax Court failed to recognize that the regulations require an "as complete valuation," which is to say the Court should have valued the pre-easement Garfield "*as if*" it had already been established that its best use was as a 45-story apartment building. Appellant's Br. 19–20. But this approach wipes a critical chess piece off the table. The key initial inquiry over a hypothetical use is whether it is "speculative" or a "reasonable probability." *1.72 Acres of Land*, 821 F.3d at 749–50, 752. For the many legitimate reasons articulated by the Tax Court, this easement proposal failed at step one. Corning Place cannot solve that problem by removing step one from the table.

Corning Place separately makes a surplusage argument. It points out that § 1.170A-14, in discussing easement valuations, elaborates on the meaning of "fair market value" while § 170A-1(c), in discussing fee simple valuations, mentions only "fair market value." Because the Tax Court's fair market value assessment of this hypothetical easement parallels how the Tax Court would handle a hypothetical fee simple valuation, Corning Place submits, the Tax Court must have gone astray. We do not see the point. The Supreme Court has long applied the same standard to value a property before an easement to the way it values a fee simple. *See Olson*,

292 U.S. at 255–56.  We thus would expect the regulations of those standards to remain parallel in looking at "fair market value."  That the Tax Code provides different levels of detail in different provisions because, say, one provision implicates more zoning, regulatory, and historic-preservation considerations (an easement) does not create surplusage.  *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385–86 (2013).  Corning Place, at any rate, never explains why § 170A-14's use of the same meaning of "fair market value" by itself serves as an instruction to ignore that meaning and to look at something other than the value of "the property . . . before the granting of the easement."

Corning Place separately contests the Tax Court's rejection of the 45-story tower for the Garfield as the best use of the pre-easement Garfield.  It points to general evidence that demand for apartments has outstripped supply in downtown Cleveland.  But, through it all, the partnership still does not provide any evidence of "demonstrated . . . market demand for the prospective" 45-story apartment tower.  *172 Acres of Land*, 821 F.3d at 754 (quotation omitted).  That gap in the record undoes its claim.

Corning Place likewise challenges the Tax Court's assessment of soft costs, such as permitting fees and financing costs.  But it still never shows why its construction-costs estimate remains anything other than speculative.

All in all, the Tax Court did not err, clearly or otherwise, in rejecting Corning Place's $22 million valuation for a charitable easement with respect to a property that it just purchased for $6 million.  Corning Place does not otherwise challenge the Tax Court's before-and-after valuation of the Garfield, and so it forfeits any objection to the Tax Court's valuation of the easement at $900,000.  *Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021).

## C.

May Corning Place claim $665,000 in easement-related expenses—Clark's appraisal services and Sandvick's architectural services—on its 2016 tax return?

A taxpayer may deduct "all the ordinary and necessary expenses paid or incurred during [its] taxable year." 26 U.S.C. § 162(a). The timing of when a taxpayer "paid or incurred" an expense depends on its form of accounting. 26 C.F.R. § 1.461-1; *see United States v. Gen. Dynamics Corp.,* 481 U.S. 239, 242 (1987). Corning Place uses accrual-based accounting. It "incur[s]" an expense when (1) "economic performance has occurred" and (2) "the amount of the liability can be determined with reasonable accuracy." *Chrysler Corp. v. Comm'r*, 436 F.3d 644, 647 (6th Cir. 2006) (quotation omitted); 26 C.F.R. § 1.461-1(a)(2). "[E]conomic performance occurs as the service[] . . . is provided." 26 C.F.R. § 1.461-4(d)(2).

The Tax Court did not err when it found that Corning Place failed to document its easement-related expenses when it relied on the engagement letters to Clark and Sandvick. The Clark letter promises appraisal services without promising when those services will occur. The Sandvick letter omits mention of a date and permits "further adjustment of the fee" until "completion of the Feasibility Analysis has occurred." App'x 508. Neither letter demonstrates that the "service . . . provided" occurred during Corning Place's 2016 tax year. The Sandvick letter does not specify Corning Place's "liability . . . with reasonable accuracy." And no evidence in the record shows what Corning Place actually paid the two consultants. Corning Place thus failed to meet its burden of showing it incurred the claimed expenses.

Corning Place resists this conclusion. It argues that it may deduct any "ordinary and necessary" expenses for the tax year, which may include easement-related expenses. 26 U.S.C. § 162(a). But that reality does not tell us *when* the company may deduct those expenses as an accrual-basis taxpayer. Even if we assume that a signed engagement letter creates an incurred expense, that does not do the trick by itself. The Clark letter is dated May 16, 2016, and let us assume for now that Corning Place engaged Sandvick at the same time. That still does not solve the problem. Recall that Corning Place did not exist as a taxable partnership between May 15 and July 7 of 2016. It thus may not claim *any* deduction incurred in that window.

D.

Did the Tax Court permissibly impose negligence and overstatement penalties on Corning Place?

The Tax Code penalizes the underpayment of taxes resulting from negligence or overvaluation. *Losantiville Country Club v. Comm'r*, 906 F.3d 468, 475 (6th Cir. 2018); 26 U.S.C. § 6662. The penalty deters taxpayers from playing the "audit lottery." *Est. of Kluener v. Comm'r*, 154 F.3d 630, 637 (6th Cir. 1998) (quotation omitted). A taxpayer may defeat a penalty by showing that it had "reasonable cause" for the underpayment and acted in "good faith." *Mortensen v. Comm'r*, 440 F.3d 375, 385 (6th Cir. 2006); 26 U.S.C. § 6664(c)(1). Reliance on professional tax advice provides a defense if the reliance itself was reasonable. *United States v. Boyle*, 469 U.S. 241, 251 (1985); 26 C.F.R. § 1.6664-4(b)(1). A taxpayer may not raise this defense when the understatement arises from a "gross" valuation overstatement of more than 200% of the correct amount. 26 U.S.C. §§ 6662(h)(2)(A)(i), 6664(c)(3). In seeking to overturn the Tax Court's negligence findings on appeal, Corning Place bears the burden of establishing these findings suffered from clear error. *Losantiville*, 906 F.3d at 475–76.

*Wrongly claiming the easement deduction.* Corning Place claimed a charitable deduction made on May 25, 2016, for a tax return that did not begin until July 7, 2016. Corning Place purportedly relied on its tax advisors to prepare the deduction, but that does not fix the problem. "The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent." *Boyle*, 469 U.S. at 252. Timeliness, then, is not a mistake a taxpayer may attribute to an advisor. The Tax Court did not clearly err in finding that Corning Place negligently claimed the Garfield donation.

*Grossly overstating the easement deduction.* Corning Place valued the easement at $22.6 million—2500% of the Tax Court's $900,000 valuation. Because this qualifies as a gross valuation overstatement (and then some), Corning Place may not defend against the corresponding penalty based on its reliance on tax advice. The Tax Court did not clearly err in finding that Corning Place grossly overstated its deduction for the Garfield easement.

*Inadequately documenting easement-related expenses.* Corning Place claimed a $665,000 business expense deduction without providing any proof of service or payment. Corning Place to this day has not provided any evidence that it ever paid Clark or Sandvick this amount. The Tax Code unambiguously requires such proof, and no claimed "reliance" on others can "function as a substitute for compliance with an unambiguous statute." *Boyle*, 469 U.S. at

251. The Tax Court did not clearly err in finding that Corning Place negligently failed to substantiate its easement-related business deduction.

We affirm.